It's a great honor to be joined today by Chief Judge Leonard Davis from the Eastern District of Texas. We had the honor of having Judge Reiter in Texas presiding over several trials down there about two years ago, so it's great to be here. If I had to have one case tried before one judge, that's the one I'd choose. There's no better trial judge, perhaps in the world. With that, let's begin. Can I remind you of that in some key instance? Okay, I get the message. First case is ROCKIES EXPRESS v. INTERIOR. Mr. Leggett. Your Honor, may it please the Court, Poe Leggett for ROCKIES EXPRESS or REX. REX appeals a decision of the Board of Contract Appeals. The Board agreed that INTERIOR had breached a multi-year contract to provide natural gas transportation, but the Board limited REX's damages to $3.3 million instead of full damages of $130 million. The decision, I will argue in a moment, is in violation of the Northern Helix precedent. The facts can be stated very briefly. February 2006, REX and INTERIOR signed a precedent agreement, P.A., for guaranteed transportation of natural gas. Under the P.A., INTERIOR committed to pay reservation fees to reserve space for a stated volume of natural gas, and they agreed on pickup point and delivery point for the gas. Counsel, can you address the jurisdiction issue? Do we have jurisdiction over this case? Well, you have jurisdiction. The government has challenged the Board's jurisdiction, and the Board had jurisdiction. The Board found correctly that all of the elements of the FTSA were already present in the precedent agreement. At Joint Appendix, page 25, it spelled that out over the course of four paragraphs. And the P.A. describes, at Appendix 272, what the government got once condition and precedent were met. First, the right to firm transportation service. And second, the construction and operation of interstate facilities to provide that service. All of that was agreed to in advance. Now, you may rightly wonder, why two contracts? It has to do with FERC. FERC requires major interstate pipeline projects first to start with precedent agreements, which are binding. That way, FERC can determine that there is enough demand for the service to warrant authorizing a company to dig a 1,600-mile trench across North America. In the approval of the precedent agreement, FERC then directs the pipeline companies, and this appears on Appendix 328, directs them to execute FTSAs from transportation service agreements for the capacity levels and terms of service represented in signed precedent agreements, end quote. So, FERC uses those second round of contracts to implement a different statutory authority to make sure that rates are just and reasonable. With respect to the Rex East, the pipeline headed east, there were no FTAS agreements, were there? Well, there was one that Interior was obliged to sign, but did not, which is why we are here. They already had one for Rex West, which took gas from Ohio to Missouri. They were obliged to sign Rex East, which would replace Rex West. There would not be two FTSAs, just one superseding FTSA. That would take the gas from Wyoming to Ohio. So the Board was right that all the elements were in the precedent agreement. There was nothing new. The precedent agreement was not an agreement to agree. The government is simply incorrect to suggest that the two agreements had different obligations. Why isn't this just a change in federal policy? First, the government did not show on the facts that the Secretary would have opted to terminate the contract,  The Board below adopted a Webster's definition of what a change of policy was. It's basically a selection of a particular course of events from alternatives. That definition would even cover a termination for convenience, and we know the parties did not mean that. At appendix page 150, you'll see language talking about royalty-in-kind program termination. We know the parties did not agree to that. So the question then is, for you, if the judge is wrong, you still have to interpret the contract. And if you look at the language of the contract, it allowed for a government out in two events, legislative action and a change in the federal policy. Legislative action, we know, requires a bicameral process in Congress. Change in federal policy under the Administrative Procedure Act requires, at a minimum, a publication of a notice in the Federal Register, which did not happen here. And according to interior precedent, it requires notice and opportunity for comment. You're saying if the President or the Secretary of a major department makes a statement that because it's not written up in the Federal Register, that deprives it of the status of federal policy? For the purpose of this contract, yes. RECS was very careful to do everything it could to reduce the chance that the department would do what it did in this case, just decide one day we don't want to run this RIK program anymore and leave RECS. But you seem to be conflating policy with regulation. If you had wished to achieve that result, wouldn't it have said, and any change in policy would have to take the form of a regulatory shift? Well, the parties certainly could have written this particular termination provision with greater precision than they did. But the phrase in question is change in the federal policy. And one thing we know about... Very broad language. But it is. But we know that there's a process required for changes in the federal policy as a matter of law. And it's fair to assume that the parties had that background of federal law in mind when they struck this bargain. Because this was a termination provision given uniquely to the Interior Department because of its status of a federal agency. The question I have in this regard is whether there was a change in federal policy with respect to the RIKs. And it seems to me when I read Secretary Salazar's testimony before Congress, he said that he is going to change, and everything points to an intent to change for about four or five months. And after that, the policy itself apparently says that any existing RIK contract will be honored. That's correct. At that point, was the RIK contract for Rex East, was that pending or was that in place? It was no longer existing because in December of 2008, Rex terminated the contract because of Interior's refusal to sign it. But you also make a point that is worth noting, and that is that the Secretary didn't actually terminate the program until sometime in December of 2009. He didn't terminate it in October as the district counsel said. The termination that we're talking about, if it did occur, would have occurred after the date that Rex said the contract was breached, right? That's correct. Would you move to the portion about the damages? Were they justified in limiting the damages based on something that occurred post-breach or not? They were not. Under the Northern Helix decision, both in the trial court and in this court's predecessor appellate division, if the government breaches a contract or if any party breaches a contract, they lose the right to use a termination clause in the defunct contract to limit damages. You'll see that explained in the appendix. Hadn't the Federal Circuit said that anticipatory damages or future damages are taken into account in considering damages even post-breach? Meaning damages that occur after breach. Certainly, that's what full damages are. It's to put us where we would characterize this $1.6 million per month payment as not something that occurs even though it's far a month after the breaches occur. That's correct because their obligation in order to reserve space was to pay us a monthly fee. It is like reserving a parking space in a garage here in Washington for a year. You owe that money whether you actually use the space or not. Under FERC's policy, our collection of that reservation fee was the means by which we were to recover the $6.8 billion we spent building the pipeline. The reservation fee is all we were asking for here in damages. We're not asking for other things we might have gotten if they had shipped gas. We took for granted in our damage calculations that they weren't. We also mitigated damages and we gave evidence of future mitigation even though that was not our burden. We just thought it was the ethical thing to do. Our full damage is $173. We reduced it by estimated mitigation in the future down to $130, which is the amount that we see. Under Northern Helix, it is very clear that the government and the board were incorrect to suggest that Helix was based only on the fact that the government could not demonstrate facts showing that it could have invoked the termination provision. Why don't we consider this as a continuing breach the same as we do in the nuclear fuel cases so that you have the contract that's still in force and the government's protected by its limitations on liability? Well, we have the right both at common law and under the contract to terminate and at common law to seek full damages. When the government made it clear that it was not going to honor the contract, we were left in a position where we either had to get them out of the contract and try to find a substitute or run the risk that we would be held that we made no attempt to mitigate our damages. So getting them out of the contract and trying to find someone in the market who would pick up that space was essential and we thought required by contract law. Couldn't the government have also stayed in the contract and tried to pick up a third party to take over their volume in the pipeline? That was an option they always had, one that we encouraged when they were not interested in pursuing. Did you have capacity to fulfill the contract? It's going back to the analogy of the parking space. What if the parking space isn't there anymore? Did you actually have capacity to supply gas on the east project? We did. As we were required to do, we built the pipeline big enough and provided the requisite pressure on the gas to make sure we could carry their gas. So let me make one final point since I'm running well into my rebuttal and that is this. This pipeline created a new market for federal gas and all gas in Wyoming and the Rockies. The government's share of royalty value increased $700 million just over the first three years of the pipeline's operation because all boats rose when that new market was opened up. If we are awarded damages of $130 million, the government still comes out financially way ahead. If we have to eat that cost, the government walks away with a windfall. If there are no more questions, I will reserve the remainder of my time. Thank you, Mr. Leggett. Ms. Kirchherr? The issues here are in three areas, jurisdiction, breach, and damages. I'd like to address jurisdiction first. The board had no jurisdiction of this matter because the precedent agreement was not a contract for the procurement of services. This court has repeatedly interpreted procurement as meaning acquisition. So you have to have an acquisition by contract with funds of supplies and services. Counsel, let me ask you this. If Rex would have attempted to have backed out of the PA, would the government have had a cause of action against Rex? I think in that situation, the law basically leaves the parties where they find them. You had a precedent agreement that would require the government to enter into an illegal contract. Rex cannot enforce it, and the government cannot enforce it. So your answer is no, it could not enforce it? Yes, and that's what I mean by the law leaves both parties where they find them. In this case, I just want to continue a little bit with the jurisdictional point first. But to escape liability, you're actually relying on provisions within the contract. But the question was what would happen, could the government enforce this precedent agreement? Our answer is no. You can't enforce it because the very essence of the precedent agreement is an obligation to sign a contract which unfortunately is illegal. If this isn't a valid contract, why is the government paying $3 million on the breach on the West End? The situation is different as to the REX West. In that case, we had signed the contract. We had used the contract. We had used the capacity. We sent gas down that pipeline, and we reserved capacity on that stretch of the pipeline. There's only one precedent agreement, correct? Yes, there's one precedent agreement. And under that precedent agreement, Rockies developed the East Pipeline. Yes, but the party's obligations, once we signed the REX East FTSA, our obligations were governed by that contract. It was a CDA contract. We got services under that contract. The government has not appealed that part of the case, and the government has already paid the damages that were allotted by the board. For the West. For the West. And so what this case is only about is the precedent agreement. But you can see that the contract for purposes of the West was a CDA contract. The West, yes, and we have paid those damages. But that is a FTSA that provided the government with services. The government got transportation services. The government committed to pay funds for those transportation services. Why isn't this just a multiple order task order contract? It's not that, because as REX itself stated, Buddy Becker stated, if the government did not sign the FTS East, then the government never got any capacity. And there was nothing that the government could ever have released to another shipper. So we never got anything. We never got any services because we didn't sign the FTS East. Counsel, what substantial evidence was raised to show that there was a change in policy that would constitute a term in the term document? The evidence that was shown was the testimony of the secretary before the Congress, in a congressional hearing, that he had made a decision that he was terminating the RIK program. But he also said that the RIK program would continue for existing shipments, right? Well, what he said was that sales contracts, if you had a contract for the sale of natural gas that you had already signed, you should fulfill that contract. And what I should point out is that these contracts for sale were typically very short-term contracts. The sales contracts were not five-year contracts, ten-year contracts. They were short-term contracts that could be terminated at ease. If you gave notice, you could terminate the contract. So what continued was the sale of natural gas to fulfill the contract. But they could, under the notice provisions, they could discontinue those contracts. And they did so such that there was no gas to ship, no gas at all available to ship on this pipeline as of October 31st. I'm getting my year wrong. I can't recall the year. But I think it's October 31st, 2009. So that was the cutoff of the damages. Counselor, let me just ask you, if the Department of Interior, assume with me for a moment that the PA is in agreement and that they agreed to pay this $1.6 million per month for the ten-year term, and that was the basis the pipeline was built upon, there's just something from a reliance standpoint or an equity standpoint that I have some trouble with. Can you explain to me what the justification could be for the Department to have said, if you will build this, we will guarantee $1.6 million a month just to reserve the pipeline, regardless of whether we flow any gas through it or not? The difficulty here is that the government entered into a contract, a precedent agreement, which then required them to enter into a subsequent contract which was illegal. It was contrary to law. And when they realized this, they realized that they couldn't sign the FTSA East. And so they sought then to somehow modify the terms with Rex so that it would be a legal contract and then they could go forward and perform under it. Rex even agreed to give a termination for convenience, didn't they? And the Department still wouldn't agree to it. What they offered in November was a contract that would have been also illegal. If you look at what they offered, they offered a contract that had provision in it that said, if this contract is illegal, you will go and you will get the deviations so that it is a legal contract. And it was in fact illegal and there was no way for the government to have entered into it. It had a 10-year term. The government couldn't agree to a 10-year term. It didn't have the FAR clauses. It also did not have a termination for convenience clause that was in accordance with the FAR. So what they offered was essentially not a compromise. It was another illegal agreement. And having signed one, the government was not about to sign a second one. Counsel, on page 1268 of the appendix is a memorandum to Wilma Lewis from the Secretary of the Interior, Ken Salazar. And it's about his announcement to terminate the RIT program. And he says, here are the guiding principles for the termination. And one of the bullets under there, that's close to the end of the page. It's the fourth bullet from the bottom. It says that they're going to honor all existing RIT sales contracts. Yes, those are the sales of natural gas. That's the gas itself. The RIT program, the government took the natural gas as the royalty and then sold it. So this is sales of gas from the government to other parties? Yes. And that's not transportation. These are the sale of natural gas. Now, as I said, these were relatively short-term contracts. And the government had the ability to terminate them by giving notice. This was a very different situation here. This was the first time the government had ever entered into a long-term, multi-year transportation contract. When I read that, and then I read it in conjunction to the statement of the policy changes that you articulated in the red brief, page 13, it says the secretary solves our analysis decision to terminate the RIT program through a phased-in termination of the program. How am I to read that particular statement, a phased-in termination of the program? The secretary sets out a phased-in program in the memorandum. And how am I to read that to exclude the type of agreement that you had with Rex? What's important to understand is that the agreement with Rex was already over, because Rex had terminated it in December of 2008. So that contract was over. What the secretary was doing was ending the RIT program. We're not going to have any more sales of natural gas, and it says we're going to honor existing sales contracts. There will be no more future sales of RIT. And what the board found is if you didn't have natural gas to ship, you wouldn't be shipping it on the pipeline. And that's precisely the circumstance that was contemplated by the clause that was negotiated by the parties. The parties negotiated a clause that allowed them to discontinue any obligations under the FTSA East if there was a change in federal policy. There was a change in federal policy in the normal construction of the term because the secretary of interior at a congressional hearing said, I am ending this program. And I'll remind you that the circumstance was that this was a hearing where Congress was reviewing whether Congress should end the program. The secretary took it upon himself to end the program because of all the abuses in the program. And that is exactly what was contemplated by this clause. Now, on the question of damages, which Your Honor is... So you're saying that the government would have terminated the agreement due to a change in policy? Yes, the question... Now, the damages question is what is the stream of payments that Rex would have obtained under the REX East agreement had it been signed? And what the board did was a perfectly ordinary thing, exactly what it's supposed to do. It compared the pre-breach world with the post-breach world. And it assumed that the parties would have signed the REX East, that it would have gone forward. And that agreement, the FTSA, had a provision in it that allowed the government to cancel on a change in policy. And the government would have exercised that provision given what the secretary of interior did and the decision he made. Would you comment about the effect of a post-breach termination in the Helix case? I know you have some time left, but that was referring to... Yes, the Helix case is not on point because that involves only one contract and assessing the damages under that contract. In this case, the damages question is different. You have to assess what are the damages under the FTSA... Well, that's assuming that we agree with you that the PA is not a contract, right? No, no, it has nothing to do with that. We're not contending that the PA is not a contract. What we've said is it is an unenforceable contract, an illegal contract. I hope I'm not creating confusion. It was the parties intended to enter into a contract, but it was an illegal contract and therefore the court cannot enforce it. Now, what you have to do, in the Helix case, there was only one contract at issue. Here, if you assume that they are entitled to damages and that you're going to enforce this illegal contract, then the question becomes what is the stream of payments that they would foreseeably have obtained under the FTSA East, had it been signed by both parties. If the parties had signed it and gone forward, the Secretary of Interior would have made the decision that he made to discontinue this program because the program was full of abuse. He made that decision. He closed down the program. You had the right under the FTSA East, in the event of the Secretary making that decision, MMSS had the right to cancel the agreement with no liability. This was a provision of the contract that they negotiated and bargained for with Rex, and it was part of the FTSA East. I think I must be over my time. Yes, that's true, Ms. Kirchner. Now, you wanted a little time to respond if the appeal came up. We'll give you a minute. Okay, thank you, Your Honor. Would you give Mr. Rader an extra minute to hear? So we'll keep the time even that way. Thank you, Judge Rader. Judge Davis, you most recently, but all three judges, raised very good questions about the federal termination right and the facts allegedly supporting it. Of course, under Northern Helix, all of that is not relevant. In Helix 3, the appellate division of the Court of Claims ruled only on the law and said that the defendant's attempted termination was ineffective. So one doesn't need to look at that. And there's an important point to make. Helix follows from the Supreme Court's rule in Hicks, 269 U.S. at 80, that damages are fixed at the time of breach. If, in an amazing burst of American efficiency, this hearing had been done in eight months, Rex would have had an award for $130 million. But because it took a lot longer, our award became unfixed in the board's view, and it dropped to $3 million. That's not allowed under Hicks or under Northern Helix. The government took some time to talk about the contract being illegal. While the government, in its initial motion to dismiss, Appendix 24, argued that the contracting officer lacked authority to sign the precedent agreement, they abandoned that position at trial. And at Record 1810, they said to the board, the government takes the position that the parties were already in the middle of the PA, and therefore the PA should not be deemed void ab initio, citing this court's precedent in AT&T, again at 1810. To the same effect, they entered into a request for admission, agreeing with us that the precedent agreement was something that the contracting officer was authorized to sign. But Arthur, I believe counsel was arguing that it wasn't a question of a valid contract of enforceability. A question of enforceability, clearly this was not a void contract. This was entered into under the Energy Policy Act of 2005, 42 U.S.C. 15902. They could enter into contracts for transportation notwithstanding any other provision of law. Now, as opposed to that, the government argues that you look at 41 U.S.C. 3903 that says there's only a five-year limit. But that very section in subsection F says, this section does not apply if another statute authorizes a multi-year contract. That's what the Energy Policy Act does. So their statute has an exception. My statute has a notwithstanding any other provision of law. I think I win that one two to nothing. Finally, in addition to their waiver and the fact that this is an enforceable contract, we remain damaged. We tried to mitigate. We acted in good faith with them. And I think that's all I need to say, unless the Court has support questions. All right. Thank you, Mr. Leggett. Ms. Kirchner, you have a minute. In this case, the contract was definitely illegal, the contemplated contract that the parties would enter into. In 1949, Congress gave the Department of Interior and other agencies authority to enter into multi-year contracts, but at that time restricted it to a maximum of five years. That's in the statute, and it was the law from 1949. It was the 1949 Act that gave the Interior the authority to enter into the contract. The Energy Policy Act does not give contracting authority. The government had contracting authority under the preexisting law. And their argument with regard to the Energy Policy Act requires an actual conflict between the two statutes. If you look carefully at the two statutes, there is no language in the statute that they are relying upon that gives contracting authority that refers to multi-year contracts or anything of the sort. So it's our contention that it is the Federal Property Administrative Services Act that gives the authority. Thank you, Ms. Kirshner.